**STATE of Minnesota, Respondent,**

v.

**Brian Douglas OSLUND, Appellant.**

**No. C3–90–1919.**

Court of Appeals of Minnesota.

May 7, 1991.

Review Denied July 24, 1991.

Hubert H. Humphrey, III, Atty. Gen., Paul R. Kempainen, Asst. Atty. Gen., St. Paul, Michael J. Thompson, Meeker County Atty. and William H. Dolan, Sp. Asst. County Atty., Litchfield, for respondent.

John M. Stuart, Minnesota Public Defender and Steven P. Russett, Asst. Public Defender, Minneapolis, for appellant.

Considered and decided by DAVIES, P.J., and LANSING and CRIPPEN, JJ.

## OPINION

CRIPPEN, Judge.

Appellant Brian Douglas Oslund challenges his convictions for criminal sexual conduct under Minn.Stat. § 609.342, subd. 1(a) (1988) (first degree sexual penetration of person under 13 by actor more than 36 months older) and Minn.Stat. § 609.343 subd. 1(h)(v) (1988) (second degree sexual contacts with person under 16 with whom actor has significant relationship).

Appellant contends the trial court erred by (1) admitting the victim's out-of-court statements in violation of his right to confront adverse witnesses; (2) admitting testimony derived from the use of anatomically correct dolls and projective story-telling cards; and (3) admitting statistical testimony on child abuse fabrications. Appellant also challenges several evidentiary rulings of the trial judge. We affirm except to vacate the second degree conviction consistent with the wishes of both parties.

## FACTS

Appellant was convicted of criminal sexual conduct for engaging in sexual acts with his three-year-old daughter, L.K.G., in October and November 1989. L.K.G. first

made allegations of abuse to appellant's ex-wife and her boyfriend, Brad Blazinski, on December 1, 1989. They brought the child to see Dr. Craig Belcourt at the Hutchinson Hospital. Dr. Belcourt's examination showed an enlarged hymen and vaginal scarring consistent with penetration. The allegations later were investigated by Meeker County social worker Patrice Thomas and Dr. Sandra Hewitt of the Midwest Children's Resource Center. L.K.G. consistently identified "daddy" as the perpetrator. At trial, appellant contended that the sexual abuse allegations were fabricated, but if true, that Blazinski was the perpetrator. Appellant was sentenced to 81 months for the first degree conviction and a concurrent 44 months for the second degree conviction.

1. The trial court found L.K.G. incompetent to testify at trial. The court therefore admitted several of L.K.G.'s out-of-court statements implicating appellant. Dr. Belcourt testified the child told him that her daddy touched her 'pee-pee.' The trial court admitted videotaped interviews with both Patrice Thomas and Dr. Hewitt, showing that L.K.G.'s statements that her daddy had pulled her pants down and touched her 'pee-pee.' L.K.G. also demonstrated intercourse with anatomically correct dolls identified as "daddy" and "L.K.G." Thomas asked the child whether "Brad" ever touched her 'pee-pee,' and she replied no.

The trial court also admitted the child's initial allegations to Blazinski. He testified that on December 1, 1989, he had been watching television with L.K.G. when she said, "You should take your pants off like daddy does." He had her repeat this and then L.K.G. said, "[M]y daddy takes his pants off and lays down. Then I take mine off and I get on top. But it doesn't hurt."

2. The videotapes of interviews by Thomas and Dr. Hewitt showed L.K.G. interacting with anatomically correct dolls. Dr. Hewitt also testified that she used projective story-telling cards in interviewing the child. These cards utilize pictures depicting parent-child interaction (*e.g.,* hugging) and the examiner asks the child to generate a story about the picture. The defense objected at trial to these methods because they are not reliable scientific tests accepted in the field. Dr. Hewitt testified that neither method is a test per se, but a tool to use with young children who cannot verbalize. Both witnesses described L.K.G.'s conduct with the dolls. Dr. Hewitt also testified that based partly on her observations of the child's use of the dolls and responses to the story cards, in her opinion abuse had occurred.

Dr. Hewitt admitted that some experts, including defense expert Dr. Ralph Underwager, object to the dolls, but Dr. Hewitt testified there is consensus that sexually abused children use the dolls in a manner that is more sexually explicit than non-abused children. Dr. Underwager testified that in his opinion, the dolls cannot be used in any reliable way, and the level of social influence by the adult interviewers made the use of the dolls with L.K.G. unreliable. Dr. Hewitt testified that the story cards are relatively new and in a formulation process.

3. At trial the defense objected to testimony elicited from Dr. Hewitt on redirect as to the percentage of child abuse reports that are false. Dr. Hewitt was allowed to testify that at the center where she works, "it's about ten percent of the cases where we don't think sexual abuse has happened." She continued:

Now, in the case where * * * it was determined this was not abuse, what percentage of these have kids making false allegations? There are a variety of studies and they look at like one was done in Denver with 500 some cases of reported child abuse allegations. * * * [Eight percent] of all those cases were false allegations. * * * Six percent were the parents making the allegations. Two percent were the children. * * * And of the children, the two percent, these were basically older kids, kids who had prior histories or had some trauma in their background that might lead them to make these statements. If you look specifically at preschoolers, you find a very, very low incidence, even lower than the

two percent. * * * The percentage is very, very small.

## ISSUES

1. Did admitting a non-testifying child's out-of-court statements about sexual abuse violate appellant's constitutional right to confront adverse witnesses?

2. Did admitting testimony derived from the use of anatomically correct dolls and projective story-telling cards constitute reversible error?

3. Did admitting testimony that less than two percent of preschoolers fabricate sexual abuse allegations constitute reversible error?

## ANALYSIS

### I. Confrontation Clause

■ Appellant argues that admission of L.K.G.'s out-of-court statements to Dr. Belcourt, Dr. Hewitt, Patrice Thomas and Blazinski violated the confrontation clause. U.S. Const. am. VI; Minn.Const.art. I, § 6. To determine whether admission of out-of-court statements by non-testifying witnesses violates the confrontation clause, a two step process is used. First, the prosecution must either produce or demonstrate the unavailability of the declarant whose statement it wishes to use against the defendant. *Ohio v. Roberts,* 448 U.S. 56, 65, 100 S.Ct. 2531, 2538, 65 L.Ed.2d 597 (1980). Once unavailability is shown, the prosecution must establish that the statement is marked with such "indicia of reliability" that admission comports with the purposes of the confrontation clause. *Id.* at 66, 100 S.Ct. at 2539.

■ *Availability.* The trial court determined that L.K.G. was incompetent to testify at trial. In Minnesota, unavailability of a witness for confrontation clause purposes can be established when the prosecution produces a witness for a competency hearing and the witness is found incom-

petent to testify at trial. *State v. Lanam,* 459 N.W.2d 656, 659 (Minn.1990), *cert. denied,* —— U.S. ——, 111 S.Ct. 693, 112 L.Ed.2d 684 (1991). Competency of child witnesses is governed by Minn.Stat. § 595.02, subd. 1(*l* ) (1990), which provides:

A child under ten years of age is a competent witness unless the court finds that the child lacks the capacity to remember or to relate truthfully facts respecting which the child is examined.

The determination of witness competence rests in the discretion of the trial judge and will not be reversed absent a clear abuse of that discretion. *State v. Cermak,* 350 N.W.2d 328, 332 (Minn.1984).

■ Appellant argues the trial court did not make findings consistent with the statute on incompetency. At the hearing, the trial court and guardian ad litem asked L.K.G. questions, but she did not answer beyond her age and birthday. The court stated in its order that it was "not able to get to those questions which would help [it] determine whether the child has the ability to recall facts and whether the child has the capacity to tell the truth." Although not precisely what the statute requires, it was not an abuse of discretion to find L.K.G. an incompetent witness where she was unresponsive even to simple preliminary questions.[1]

■ *Reliability.* Reliability of an unavailable witness's out-of-court statements can be established either by showing the statement falls within a firmly rooted hearsay exception or has other "particularized guarantees of trustworthiness." *Roberts,* 448 U.S. at 66, 100 S.Ct. at 2539. To determine whether a statement has particularized guarantees of trustworthiness in a child sex abuse case, the court must look at the totality of circumstances surrounding the making of the statement that make the declarant worthy of belief. *Idaho v. Wright,* 497 U.S. ——, ——, 110 S.Ct. 3139, 3148, 111 L.Ed.2d 638 (1990). The Court

---

1. Because we affirm the trial court's finding of unavailability, we need not address whether admitting hearsay statements of a non-testifying but available witness violates the confrontation clause. *See State v. Larson,* 453 N.W.2d 42,

45–46 (Minn.), *cert. granted and judgment vacated,* —— U.S. ——, 111 S.Ct. 29, 112 L.Ed.2d 7 (1990) (remanded for reconsideration in light of *Idaho v. Wright,* 497 U.S. ——, 110 S.Ct. 3139, 111 L.Ed.2d 638 (1990)).

set out a list of relevant circumstances to consider in making this determination: (1) spontaneity and consistent repetition; (2) use of terminology unexpected of a child of similar age; (3) statements elicited without leading questions; and (4) lack of motive to fabricate. *Id.* at ——, 110 S.Ct. at 3150. In *Wright*, the Court held not reliable statements by the child to a medical doctor because the child's abuse allegations were made as part of a highly suggestive interview. *Id.* at ——, 110 S.Ct. at 3152.

■ The trial court found that each of L.K.G.'s challenged statements had sufficient guarantees of trustworthiness under *Roberts* and *Wright*. We are satisfied that the statements made to Dr. Belcourt, Dr. Hewitt and Patrice Thomas are sufficiently reliable. L.K.G.'s statements were in language one would expect a child of her age to use. The acts she demonstrated and described were of a nature one would not expect a three-year-old to know. Her statements were reasonably spontaneous, and leading questions, when used, were not overly suggestive. The three witnesses testifying to the child's statements had no motive to fabricate.

■ The most problematic statement is the initial allegation to Blazinski identifying appellant as the abuser. Part of appellant's defense was that Blazinski was the perpetrator. Blazinski also had an intimate relationship with appellant's ex-wife, and the allegations were made during dissolution proceedings. Furthermore, a former babysitter and appellant's sister testified that L.K.G. called both Blazinski and appellant "daddy."

The trial court, in its order admitting the statement to Blazinski, specifically found that Blazinski was a reliable witness, the statements by L.K.G. were spontaneous and the language used was typical of a

child her age. The statements also were repeated consistently to others, although this factor is less compelling because the statement to Blazinski was the first instance in which appellant was identified. Looking at the totality of the circumstances surrounding this statement, on this record we are not able to find a clear abuse of discretion by the trial judge.

## II. Anatomically Correct Dolls and Projective Story–Telling Cards

Appellant challenges the trial court's admission of testimony by Patrice Thomas and Dr. Sandra Hewitt derived from interviews using anatomically correct dolls and projective story-telling cards. Appellant contends these methods should be subject to the *Frye* test on emerging scientific techniques, and that they fail this test because they are inherently unreliable and were used improperly in this case. Appellant did not request a *Frye* hearing before the trial court.

■ The test for determining the admissibility of testimony derived from the use of emerging scientific techniques is named for *Frye v. United States*, 293 F. 1013 (D.C.Cir.1923). A proper foundation for a scientific test requires the proponent of the test to establish that it is generally accepted in the scientific community as reliable and that the test as used in the particular case conformed to accepted procedures. *State v. Moore*, 458 N.W.2d 90, 98 (Minn. 1990). The question of proper foundation is largely within the discretion of the trial court. *Id.*

■ We agree with the state that the dolls and story cards are not scientific tests subject to *Frye*, but primarily illustrative tools. Interpretation is a small aspect of the expert testimony derived from these techniques.[2] Rather, the experts simply

2. In this sense, the dolls and story cards are unlike the scientific method called interpretive drawing analysis, which this court subjected to the the *Frye* test. *State v. Kraushaar*, 459 N.W.2d 346, 349 (Minn.App.1990), *pet. for rev. granted* (Minn. Oct. 18, 1990). In *Kraushaar*, the state's expert testified she read in a pediatric journal that children for whom abuse is substantiated are 6.4 times more likely to have

genitals in their drawings than children who have not been abused. *Id.* The expert never met the child complainant, but examined the child's drawings in order to testify that in her opinion the drawings "depicted male genitals and demonstrated [the child] had been sexually abused." *Id.* The court held that the admissibility of this scientific evidence was a matter for a *Frye* hearing. *Id.* at 350. Unlike this drawing

present the child's responses to these stimuli. These techniques do not constitute scientific testing insofar as the interviewer is using these aids to discover what the child can or is attempting to communicate. We discern no material difference between this use and the use of the dolls in *State v. Eggert,* where this court approved the use of anatomically correct dolls as testimonial aids to assist the jury when a witness testifies at trial. *State v. Eggert,* 358 N.W.2d 156, 161 (Minn.App.1984).[3]

■ To the extent the experts here also used these techniques as a basis for rendering an expert opinion on the occurrence of abuse, we think the state met its burden to show the techniques are accepted and reliable through the testimony of Dr. Hewitt.[4] Even under a *Frye* analysis, the trial court did not abuse its discretion by allowing this testimony.

■ Even assuming error, given the other evidence in the case, it was harmless. When a trial error does not involve constitutional guarantees, the error warrants reversal only if it is likely that the error substantially influenced the jury to convict. *See State v. Carlson,* 268 N.W.2d 553, 561 (Minn.1978). Any error in the weight given to the interpretive testimony of Dr. Hewitt is minimized by the fact that appellant engaged in vigorous cross examination of this

witness. Furthermore, the jury was given the directly conflicting testimony of Dr. Underwager disputing the reliability of these methods.

### III. Statistical Testimony on Fabrication

■ Appellant contends it was reversible error to admit Dr. Hewitt's testimony that less than two percent of sexual abuse allegations by preschoolers are fabricated. We agree that this testimony was erroneously admitted, but conclude that the error was harmless.

Trial courts have broad discretion in deciding whether testimony of qualified experts should be received, and this determination will be reversed only for a clear abuse of that discretion. *State v. Helterbridle,* 301 N.W.2d 545, 547 (Minn.1980); *see* Minn.R.Evid. 702. It is error to admit expert opinion testimony on the truth or falsity of a witness's allegations about a crime, "for the expert's status may lend an unwarranted 'stamp of scientific legitimacy' to the allegations." *State v. Myers,* 359 N.W.2d 604, 611 (Minn.1984) (citation omitted) (child sexual abuse case); *accord Adesiji v. State,* 384 N.W.2d 908, 912 (Minn. App.1986) (expert testimony on the truthfulness of sexual abuse allegations by children in general is improper), *pet. for rev. denied* (Minn. June 13, 1986).[5]

analysis, which is entirely a matter of expert interpretation of a child's conduct, the anatomically correct dolls and projective story-telling cards primarily act as devices to relay information from the child to the interviewer.

3. Testimony reporting this illustrative use of the dolls has been accepted by Minnesota courts in numerous opinions even where the child did not testify at trial. *See, e.g., State v. Lanam,* 459 N.W.2d 656, 657 (Minn.1990) (testimony on child's use of anatomically correct dolls with social worker and police officer), *cert. denied,* — U.S. ——, 111 S.Ct. 693, 112 L.Ed.2d 684 (1991); *State v. Larson,* 453 N.W.2d 42, 44 (Minn.) (testimony admitted on child's use of anatomically correct dolls in psychotherapy sessions), *cert. granted and judgment vacated,* — U.S. ——, 111 S.Ct. 29, 112 L.Ed.2d 7 (1990); *State v. Burns,* 394 N.W.2d 495, 496 (Minn.1986) (testimony admitted on child's use of anatomically correct dolls with social worker and police officer); *State v. Erickson,* 454 N.W.2d 624, 625– 26 (Minn.App.1990) (videotaped interview admitted of police officer using anatomically cor-

rect dolls to interview child), *pet. for rev. denied* (Minn. May 23, 1990).

4. This court has implicitly accepted the reliability of expert opinion on the occurrence of abuse based on the use of the dolls. *E.g., State v. Campa,* 390 N.W.2d 333, 334–35 (Minn.App. 1986) (psychologist testified to opinion that abuse occurred based in part on interviews with child using anatomically correct dolls), *pet. for rev. denied* (Minn. Aug. 27, 1986); *State v. Fitzgerald,* 382 N.W.2d 892, 893–94 (Minn.App.1986) (psychologist testified that children's demonstrations with dolls were abnormal for their age, and suggested abuse), *pet. for rev. denied* (Minn. Apr. 24, 1986); *State v. Folley,* 378 N.W.2d 21, 25–26 (Minn.App.1985) (psychologist testified that children demonstrated episodes of sexual abuse with dolls during therapy).

5. Dr. Hewitt's testimony is also objectionable under a line of cases discouraging the use of testimony phrased in terms of statistical probabilities because such statements are likely to have an exaggerated impact on the trier of fact.

We must determine whether this evidentiary error was harmless. *See Carlson,* 268 N.W.2d at 561 (nonconstitutional trial error is harmless unless it substantially influences the jury to convict). The strength of the state's case is one factor to consider in making this determination. *Id.* In this case, Dr. Hewitt's testimony was a single reference in the course of her voluminous testimony on the subject matter. The state did not refer to the testimony in closing arguments. Given the extensive evidence justifying the jury's verdict, we conclude the error is harmless.

Finally, appellant contends the trial court erred in several evidentiary rulings: (1) refusing to allow Dr. Underwager, a psychologist, to impeach the methodology of studies relied on by Dr. Belcourt, a medical doctor; (2) allowing testimony on appellant's violent nature and drinking; (3) refusing to allow character evidence to impeach the testimony of appellant's ex-wife and Blazinski. We have examined appellant's arguments on these issues and find them to be without merit. In each instance, the trial court's judgments were within the broad parameters of its discretion.

## DECISION

We affirm appellant's conviction for first degree criminal sexual conduct under Minn. Stat. § 609.342, subd. 1(a). We vacate his conviction for second degree criminal sexual conduct under Minn.Stat. § 609.343, subd. 1(h)(v) in accordance with the wishes of both parties and the dictates of Minn. Stat. § 609.035 (1990) (barring multiple convictions for lesser included offenses).

Affirmed in part, reversed in part.

See *State v. Schwartz,* 447 N.W.2d 422, 428 (Minn.1989) (collecting cases).